**UNITED STATES of America**

v.

**HERBERT BRYANT INCORPORATED, et al.**

No. 75–1440.

United States Court of Appeals, District of Columbia Circuit.

Argued 8 April 1976.
Decided 6 July 1976.

Kathryn A. Oberly, Atty., Dept. of Justice, Washington, D. C., for appellant. Wallace H. Johnson, Asst. Atty. Gen., Washington, D. C., at the time the brief was filed, David W. Miller, Jacques B. Gelin and Lawrence E. Shearer, Attys., Dept. of Justice, Washington, D. C., were on the brief for appellant.

Agustus C. Epps, Richmond, Va., with whom Charles F. Midkiff, Richmond, Va., Robert F. Condon and Michael E. Kris, were on the brief for appellee, Robinson Terminal Warehouse Corp., argued for all appellees.

Cyril D. Calley, Alexandria, Va., was on the brief for appellee City of Alexandria. J. Howard Middleton, Jr., Alexandria, Va., entered an appearance for appellee City of Alexandria.

Albert E. Brault, Washington, D. C., was on the brief for appellee, Old Dominion Boat Club.

William E. O'Neill, Jr., Washington, D. C., was on the brief for appellees, Potomac Arms Corp. and John C. Richards.

W. Curtis Sewell, Washington, D. C., was on the brief for appellees, Crenshaw and Norton and Co., Inc.

Jo V. Morgan, Jr., Washington, D. C., was on the brief for appellee, The Texas Co.

John J. Adams, Richmond, Va., was on the brief for appellees, Robinson Realty Corp. and Virginia Electric and Power Co.

Leonard C. Greenebaum, Washington, D. C., was on the brief for appellee, Thomas H. Andrews, Inc.

Plato Cacheris, Alexandria, Va., was on the brief for appellee Norton and Co.

Robert E. Nagle, Washington, D. C., entered an appearance for appellee Old Town Yacht Basin, Inc.

George H. Clark, Washington, D. C., entered an appearance for appellee, Slater's Lane, Inc.

John J. Adams, Richmond, Va., entered an appearance for appellees Sand & Gravel Properties, Inc., and Southern Railway Co.

Mark Foster, entered an appearance for appellees Crenshaw.

Before McGOWAN, ROBINSON and WILKEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILKEY.

WILKEY, Circuit Judge:

This is an appeal by the United States from a memorandum and order[1] of the United States District Court for the District of Columbia (Corcoran, J.) dismissing as to thirty of thirty-six named defendants the Government's action to quiet title to certain lands along the Alexandria, Virginia, waterfront.[2] The lands involved are submerged and artificially created fast lands which have been added to the Alexandria

---

1. *United States v. Bryant,* 386 F.Supp. 1287 (D.D.C.1974).

2. "[A]ll fast and submerged lands in Virginia or the District of Columbia bounded on the south by the north line of the United States Navy pier, as such line extends shoreward, such line being 176 feet 7 inches south of the south line of Gibbon Street and on the north by the south

property line of parklands of the United States, such line being approximately 500 feet north of and parallel to the street known as Slater's Lane, and as said boundaries would extend into the River, and on the west by the January 24, 1791, high water mark of the Potomac River, as such lands extend into the River. . . ." Complaint of the United States J. A. at 28–29.

waterfront since 24 January 1791, the date the State of Maryland ceded to the United States the land now comprising the District of Columbia. The United States' action was brought pursuant to section 1 of the Act of 27 April 1912, ch. 96, 37 Stat. 93 (hereinafter the 1912 Act), as affirmed by section 103 of the Act of 31 October 1945, ch. 443, 59 Stat. 552 (hereinafter the 1945 Act).

Appellees, record owners or interest holders of Alexandria waterfront property, challenged the jurisdiction of the United States District Court for the District of Columbia to entertain an action to quiet title to real property located on the Virginia side of the pierhead line between the interception of the pierhead line and Second Street, Alexandria, and the interception of the pierhead line and the southeastern Maryland-District of Columbia boundary line. Appellees asserted that sections 101 and 102 of the 1945 Act[3] settled the long-standing boundary dispute between the Commonwealth of Virginia and the District

of Columbia by establishing a new boundary at the pierhead line, and that any action to quiet title to real property on the Virginia side of this new boundary must be brought in the United States District Court for the Eastern District of Virginia.

Although the United States opposed appellees' motions to dismiss on the ground that section 103 of the 1945 Act expressly preserved the District Court's jurisdiction to adjudicate actions brought by the United States to quiet title to lands along the Alexandria waterfront, the District Court concluded that as to thirty of the named defendants it was without jurisdiction and on 29 January 1975 dismissed the Government's action against those defendants.[4] We agree with the position of the United States, and therefore reverse the decision of the District Court.

## I. HISTORICAL AND STATUTORY BACKGROUND

This dispute, both in its present jurisdictional posture and in its substantive aspects

---

Hereinafter we will refer to this area as "the Alexandria waterfront."

**3.** Quoted *infra* at 177 U.S.App.D.C., —— – —— & n. 25, 543 F.2d 305–306 & n. 25, respectively.

**4.** In its memorandum opinion of 9 December 1974 the District Court explained its disagreement with the Government's position as follows:

It is the Government's position that § 103 of the 1945 Act explicitly reserves exclusive jurisdiction in this Court over the disputed lands notwithstanding that they lie within the territorial limits of Virginia because formerly the "very lands here in controversy were within the territorial limits of this Court for quiet title actions brought by the United States," by virtue of the 1912 Act and pertinent decisions of the Supreme Court. The defendants, on the other hand, contend that the 1945 Act does no more than preserve this Court's jurisdiction over lands described in the Act of 1912, *i. e.,* land in the District of Columbia. They bolster this assertion by noting that Section 202 of the 1945 Act extends the jurisdiction of the District Court for the Eastern District of Virginia over the area within which the disputed lands lie, and that it would be unreasonable to deprive that Court of jurisdiction over such lands.

The Court's view of § 103 is that it is a legislative reaffirmation of the 1912 Act, that the term "said Act" clearly refers to the 1912 Act, and that the "lands" referred to in § 103 are those lands "in the District of Columbia" as specified by the 1912 Act. This conclusion is consistent with the terms of § 202, which amended the then-Judicial Code so as to embrace within the boundaries of the District Court for the Eastern District of Virginia the land ceded to Virginia by §§ 101 and 102 of the 1945 Act.

386 F.Supp. at 1291–92 (footnote omitted). Accordingly, the District Court dismissed those defendants claiming ownership or an interest in land on the Virginia side of the pierhead line running between Gibbon Street on the south and Second Street on the north. Based on a dispute as to whether certain parcels of land between Third Street and Slater's Lane are in Virginia or the District of Columbia, the District Court retained jurisdiction over six defendants. The court's order, entered 29 January 1975, included a certification pursuant to Fed.R.Civ.P. 54(b) so as to permit immediate appellate review.

The reasons we reach a different conclusions from that of the District Court are found in sections II and III of this opinion *infra*.

relating to title, arises out of a one-hundred-and-thirty-year-old boundary dispute between the Commonwealth of Virginia and the District of Columbia. The dispute began in 1846 when Congress retroceded to Virginia the land it had ceded to the United States for the creation of a federal city.[5]

The United States takes the position, with which we agree, that, since this retrocession included only those lands which Virginia had originally ceded in 1791, the boundary in 1846 between the District of Columbia and Virginia became the high-water mark on the Virginia side of the Potomac River as of 24 January 1791. Any land, either submerged or fast, on the District of Columbia side of the 1791 high-water mark remained in the District of Columbia since it was part of the 24 January 1791 Maryland cession to the United States.

In order to clarify and protect federal interests along the Alexandria waterfront, Congress in 1912 enacted the following statute:

. . . That for the purpose of establishing and making clear the title of the United States it shall be the duty of the Attorney General of the United States to institute as soon as may be, or whenever in his judgment it is deemed proper, a suit or suits in the Supreme Court of the District of Columbia [now the United States District Court for the District of Columbia] against all persons and corporations, or others, who may have, or pretend to have, any right, title, claim, or interest adverse to the complete title of the United States in and to any part or parcel of the land or water *in the District of Columbia* in, under, and adjacent to the Potomac River, the Anacostia River or Eastern Branch, and Rock Creek, including the shores and submerged or partly submerged land, as well as the beds of said waterways, and also the upland immediately adjacent thereto, including made lands, flats, and marsh lands.[6]

However, no general action to adjudicate title to lands lying along the Alexandria waterfront was initiated until 21 December 1973 when the United States filed the suit now before this court.

Since 1912 the Alexandria waterfront has been extended (artificially and perhaps naturally) into the Potomac River at several places, and jurisdictional uncertainties increasingly have plagued law enforcement activities in the area. To alleviate this problem, Congress passed the 1945 Act to

---

5. The pertinent provisions of "An Act to retrocede the County of Alexandria, in the District of Columbia, to the State [sic] of Virginia" provide as follows:

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That, with the assent of the people of the county and town of Alexandria, to be ascertained as hereinafter prescribed, all of that portion of the District of Columbia ceded to the United States by the State [sic] of Virginia, and all the rights and jurisdiction therewith ceded over the same, be, and the same are hereby, ceded and forever relinquished to the State of Virginia, in full and absolute right and jurisdiction, as well of soil as of persons residing or to reside thereon.

Sec. 2. *And be it further enacted,* That nothing herein contained shall be construed to vest in the State [sic] of Virginia any right of property . . . in the soil of the territory hereby receded, so as to affect the rights of individuals or corporations therein . . .

Act of 9 July 1846, ch. 35, §§ 1 & 2, 9 Stat. 35.

6. Act of 27 April 1912, ch. 96, § 1, 37 Stat. 93. Appellees and the District Court place a great deal of reliance on the five words "in the District of Columbia" italicized above. We explain why this reliance is misplaced *infra* at 177 U.S.App.D.C. ————, 543 F.2d 303–306.

The District Court also suggests that "the [1912] Act was designed primarily to meet the problems of the Anacostia River reclamation, . . ." *i. e.,* not to meet the problems of the Alexandria waterfront. 386 F.Supp. at 1290 (footnote omitted). While the Anacostia River reclamation project may well have been the motivating force behind the 1912 Act, the same House report cited as authority by the District Court states that "[t]he bill also provides for the settlement of any *future* questions along the river frontage of the District where the United States has a claim of rights." H.R.Doc. No. 513, 62d Cong., 2d Sess. 1 (1912) (emphasis added).

"establish a definite clear-cut boundary line, easy to recognize and convenient *for police and court jurisdiction.* . . ." [7] By ceding *concurrent jurisdiction* to the Commonwealth of Virginia over all lands located between the pierhead line and the mean high-water mark of 1791, this statute established the pierhead line as the new jurisdictional boundary between Virginia and the District of Columbia, at least for *law enforcement (i. e., police and court) purposes.*

Section 103 of the 1945 Act, however, specifically preserved the exclusive jurisdiction of the United States District Court for the District of Columbia to determine the title to lands lying along the Alexandria waterfront:

> Sec. 103. Nothing in this Act shall be construed as relinquishing any right, title, or interest of the United States to the lands lying between the mean high-water mark as it existed January 24, 1791, and the boundary line as described in section 101; *or to limit the right of the United States to establish its title to any of said lands as provided by Act of Congress of April 27, 1912* (37 Stat. 93); *or the jurisdiction of the courts of the United States for the District of Columbia to hear and determine suits to establish the title of the United States in all lands in the bed, marshes, and lowlands of the Potomac River, and other lands as described by said Act below the mean high-water mark of January 24, 1791* . . . .[8]

## II. JURISDICTION TO ADJUDICATE THE UNITED STATES' ACTION TO QUIET TITLE

The jurisdictional issue in this case turns entirely upon an interpretation of four interrelated statutory provisions: section 1 of the 1912 Act and sections 101, 102, and 103 of the 1945 Act.

In section 1 of the 1912 Act, Congress directed the Attorney General of the United States to institute suits in the Supreme Court of the District of Columbia (the predecessor of the United States District Court for the District of Columbia) to establish and make clear the title of the United States to submerged and fast lands along the Potomac River within the boundaries of the District of Columbia *as it then existed.*[9] These four italicized words are critical to the outcome of this case. In view of the District Court's and appellees' heavy reliance on the fact that section 1 of the 1912 Act only directs the Attorney General to bring suits in the United States District Court for the District of Columbia against entities who may have an interest adverse to the United States' interest in lands "in the District of Columbia," [10] the pivotal question becomes: what lands (fast or submerged) were "in the District of Columbia" in 1912 when Congress used this language?

After the 1931 Supreme Court decision in *Smoot Sand & Gravel Corp. v. Washington Airport, Inc.,*[11] it is indisputable that *in 1912* the jurisdictional boundary (for all purposes) between Virginia and the District of

---

**7.** H.R.Doc. No. 595, 79th Cong., 1st Sess. 1 (1945) (emphasis added); S.Doc.No.598, 79th Cong., 1st Sess. 2 (1945) (emphasis added).

**8.** Act of 31 Oct. 1945, ch. 443, § 103, 59 Stat. 552 (set out as a note under D.C.Code Ann. § 1–101 (1973)).

**9.** Section 1 is quoted, in relevant part, *supra* at 177 U.S.App.D.C. ——–——, 543 F.2d 302–303. Additionally, we note that section 4 of the 1912 Act provides as follows:

> Sec. 4. That if on the final hearing of said cause the said Supreme Court of the District of Columbia [*i. e.,* the United States District Court for the District of Columbia] shall be of opinion that there exists any right, title, or interest in the land or water in this Act men-

tioned in any person, or corporation, or others, adverse to the complete and paramount right of the United States, the said court shall forthwith and in a summary way proceed to ascertain the value of any such right, title, interest, or claim, exclusive of the value of any improvement to the property covered by such right, title, or interest made by or under the authority of the United States, and report thereof shall be made to the Congress.

Act of 27 April 1912, ch. 96, § 4, 37 Stat. 93.

**10.** Act of 27 April 1912, ch. 96, § 1, 37 Stat. 93. *See* note 4 *supra.*

**11.** 283 U.S. 348, 51 S.Ct. 474, 75 L.Ed. 1109 (1931).

Columbia was the high-water mark of the Potomac River on the Virginia side as of 24 January 1791, *not* the pierhead line later established *in 1945* for law enforcement and perhaps other purposes. In *Smoot,* speaking through Justice Holmes, the Court explained:

> The Circuit Court of Appeals states that the sole question presented is whether the boundary line between Virginia and the District of Columbia is at high or at low water mark on the Virginia side of the Potomac, and that is the only question argued here. In view of the previous decisions and intimations of this Court it does not need extended discussion now.
>
> It must be assumed, notwithstanding some suggestion of ancient controversies, that the title of Maryland was that conveyed to Lord Baltimore by the charter of Charles I. and ran to and along the farther bank of the Potomac River. *Marine Railway & Coal Co. v. United States,* 257 U.S. 47, 63 [42 S.Ct. 32, 66 L.Ed. 124]. This means that the boundary was the usual high water mark, *Oklahoma v. Texas,* 260 U.S. 606, 626, *et seq.* [43 S.Ct. 221, 67 L.Ed. 428]; so that the only question is whether anything has happened since to change the original line.[12]

Appellees attempt to discredit the authority of *Smoot* on three grounds. First, they complain that "[n]o one, including the United States, knows the whereabouts of the high water mark of the Potomac River as it existed in 1791." Second, they assert that the Government wants the boundary line between the District of Columbia and Virginia "categorically limited . . . to the original 1791 high water mark . . ." notwithstanding the *Smoot* Court's reference to *Oklahoma v. Texas* where the Court had previously recognized the effect of such natural boundary-changing forces as accretion and erosion. Third, appellees contend that the Government's (and this court's) reading of *Smoot* "is in direct conflict with

section two of the Act of Retrocession" of 9 July 1846.[13]

■ As to appellees' first objection, we accept the Government's response that while it may not be able to locate indisputably the 1791 high-water mark at this time, it could "after discovery and adequate test or core drilling, establish which portions of the disputed area were artificially filled after 1791."[14] Thus, the fact that no one at this moment can precisely locate the 1791 line does not diminish—especially from a jurisdictional perspective—the importance of the *Smoot* Court's approval of that line, nor mean—from the standpoint of the merits—that the Government will not be able to prove title to any of the property at issue in this case.

■ As to appellees' second objection, we again agree with the Government's response: "The exact location of the 1791 high water line is, essentially irrelevant *in a jurisdictional sense,* since Congress directed that these issues be determined in the United States District Court for the District of Columbia."[15] In other words, at least *insofar as jurisdiction is concerned,* Congress saw fit in the Acts of 1912 and 1945 to overrule legislatively the common law doctrines of accretion and erosion.

■ So long as there is a genuine dispute over title (*i. e.,* a dispute over present title or the location of present-day boundaries) the District Court for the District of Columbia has, by virtue of the 1912 Act, exclusive subject matter jurisdiction over Government-initiated quiet title actions involving Alexandria waterfront property. Perhaps the District Court will decide that, through sections 101 and 102 of the 1945 Act, Congress intended to relinquish *all* title claims (not just law enforcement jurisdiction) to the Alexandria waterfront property, but in section 103 decided, in case a dispute arose, to preserve in the District of Columbia federal courts the exclusive subject matter jur-

---

12. *Id.* at 350, 51 S.Ct. at 475.

13. Appellee's Brief at 23 & 25.

14. Government Reply Brief at 2 n.2.

15. *Id.* (emphasis added).

isdiction established by the 1912 Act.[16] Nevertheless, even this determination on the merits would *not* deprive the court of subject matter jurisdiction over this title dispute.

Finally, we do not understand how appellees find the Government's and this court's interpretation of *Smoot* to be "in direct conflict with section 2 of the Act of Retrocession . . . " of 9 July 1846.[17] In the first place, since this Act only retroceded lands on the Virginia side of the 1791 highwater line (the land Virginia originally ceded), it does not affect the Alexandria waterfront property now in dispute.[18] Moreover, section 2 talks only in terms of not vesting "*in the State of Virginia* any right of property"; [19] it does not speak to the rights (or lack thereof) of the United States.

Again borrowing the words of Justice Holmes, we conclude that " . . . the only question is whether anything has happened since [1912] to change the original [1791] line." [20] Appellees, with whom the District Court agreed, suggest that the 1945 Act somehow shrunk the 1912 quiet title jurisdiction of the District Court down to

those lands which are *both* in the District of Columbia (according to the *new* boundary established by section 101 of the 1945 Act) *and* east of the 1791 high-water mark. Of course, *in 1912* these two requirements—being in the District of Columbia and being east of the 1791 high-water mark—were one and the same requirement; after 1945, however, the former no longer included all of the latter. We turn now to the relevant provisions of the 1945 Act.

The Act of 31 October 1945 was passed by Congress, at the urging of the Attorney General, for the express purpose of "establish[ing] a definite clear-cut boundary line, easy to recognize and convenient *for police and court jurisdiction,* between the District of Columbia and the Commonwealth of Virginia." [21] Both the Senate and the House reports on the 1945 Act explain,

. . . The bill in no way affects property rights and claims as they now exist in this area. It establishes definitely the Federal courts in which all *criminal* offenses will be tried [*i. e.,* the District Court for the Eastern District of Virginia].[22]

16.  *But see* Act of 31 Oct. 1945, ch. 443, § 103 (first clause), 59 Stat. 552 *and* the legislative history quoted in the text at note 22 *infra.*

17.  Appellees' Brief at 23.  Section 2 of this Act is quoted, in relevant part, at note 5 *supra.*

18.  Appellees in moving to dismiss for lack of jurisdiction and the District Court in granting appellees' motions as to thirty of the named defendants appear to have accepted the Government's assertion that "the land area giving rise to this action is located . . . riverward of the highwater mark of the Potomac River on the Virginia side as of January 24, 1791 . . . ." Government Brief at 12–13. In any event, if appellees do not agree with this assertion, on remand the District Court will have to decide this threshold jurisdictional issue, and appellees will have ample opportunity to make their position known. If, on remand, the District Court finds that the land here at issue is situated *on the Virginia side* of the 1791 high-water line, then, of course, the 1912 Act would *not* confer jurisdiction upon the court, and the case would have to be dismissed.

19.  Act of 9 July 1846, ch. 35, § 2, 9 Stat. 35 (emphasis added).

20.  *Smoot Sand & Gravel Corp. v. Washington Airport, Inc.,* 283 U.S. at 350, 51 S.Ct. at 475.

21.  H.R.Doc.No.595, 79th Cong., 1st Sess. 1 (1945) (emphasis added); S.Doc.No.598, 79th Cong., 1st Sess. 2 (1945) (emphasis added). The Attorney General informed Congress,

[A]t present the enforcement of the criminal law is hampered, and at times even frustrated, by reason of the uncertainty as to what courts have jurisdiction over *criminal* offenses committed within the disputed area. H.R.Doc.No.595, 79th Cong., 1st Sess. 2 (1945) (emphasis added); S.Doc.No.598, 79th Cong., 1st Sess. 2 (1945) (emphasis added).

22.  H.R.Doc.No.595, 79th Cong., 1st Sess. 2 (1945) (emphasis added); S.Doc.No.598, 79th Cong., 1st Sess. 2 (1945) (emphasis added). *Accord,* H.R.Doc.No.513, 62d Cong., 2d Sess. 2 (1912) re the 1912 Act:

The bill has no other effect than to provide a means to quiet title. . . . The matter of future disposition of the land is not affected and the question of the acquirement of private rights which may de [*sic* ] determined to exist, as well as the disposition of the land confirmed in the United States, is left to the future *action of the Congress.*

**306**

Section 101 of the 1945 Act established the *new* boundary between the District of Columbia and Virginia for law enforcement (and perhaps other) [23] purposes as follows:

Said boundary line shall begin at a point where the northwest boundary of the District of Columbia intercepts the high-water mark on the Virginia shore of the Potomac River and following the present mean high-water mark; thence in a southeasterly direction along the Virginia shore of the Potomac River to Little River, along the Virginia shore of Little River to Boundary Channel, along the Virginia side of Boundary Channel to the main body of the Potomac River, along the Virginia side of the Potomac River across the mouths of all tributaries affected by the tides of the river to Second Street, Alexandria, Virginia, from Second Street to the present established pierhead line, and following said pierhead line to its connection with the District of Columbia-Maryland boundary line; that whenever said mean high-water mark on the Virginia shore is altered by artificial fills and excavations made by the United States, or by alluvion or erosion, then the boundary shall follow the new mean high-water mark on the Virginia shore as altered, or whenever the location of the pierhead line along the Alexandria water front is altered, then the boundary shall follow the new location of the pierhead line.[24]

Although section 102 of the Act cedes to Virginia sovereignty and *concurrent jurisdiction* with the United States over the area between the 1791 high-water mark and section 101's newly established pierhead line,[25] *section 103 expressly states that the Act is to have no effect on* (1) "any right, title, or interest of the United States" in these lands, (2) "the right of the United States to establish its title to any of [these] lands as provided by [the 1912 Act]," or (3) "the jurisdiction of the courts of the United States for the District of Columbia to hear and determine suits to establish the title of the United States in all lands in the bed, marshes, and lowlands of the Potomac River, and other lands as described by said Act [the 1912 Act] below the mean high-water mark of January 24, 1791 . . . ."[26]

According to the Supreme Court's decision in *Smoot*, the "lands as described by said Act [the 1912 Act]"[27] and "in the District of Columbia"[28] before passage of the 1945 Act, were those lands along the Alexandria waterfront below the mean high-water mark of 24 January 1791. Clearly, the House and Senate saw it this way when they passed the 1945 Act. In their respective reports, both Houses of the Congress recognized,

. . . The United States Supreme Court has set the boundary line between the District of Columbia and the Commonwealth of Virginia at the high-water mark of the Potomac on the Virginia shore as it existed when the District of Columbia was created in 1791. (*Smoot Sand and Gravel Corporation v. Washington Airport,* 283 U.S. 348, 51 S.Ct. 474, 75 L.Ed. 1109, decided May 4, 1931.)[29]

**23.** *But see* the language from both the House and the Senate reports on the 1945 Act quoted in the text accompanying note 22 *supra.*

**24.** Act of 31 Oct. 1945, ch. 443, § 101, 59 Stat. 552.

**25.** Section 102 provides:
All that part of the territory situated on the Virginia side of the Potomac River lying between the boundary line as described in section 101 and the mean high-water mark as it existed January 24, 1791, is hereby ceded to and declared to be henceforth within the territorial boundaries, jurisdiction, and sovereignty of the State [*sic*] of Virginia: *Provided, however,* That concurrent jurisdiction over the said area is hereby reserved to the United States.
*Id.* § 102.

**26.** *Id.* § 103.

**27.** *Id.*

**28.** Act of 27 April 1912, ch. 96, § 1, 37 Stat. 93.

**29.** H.R.Doc.No.595, 79th Cong., 1st Sess. 1 (1945); S.Doc.No.598, 79th Cong., 1st Sess. 2 (1945).

## III. CONCLUSION

The District Court's determination that it does not possess subject matter jurisdiction over this quiet title action flies directly in the face of section 103's clear and specific preservation of "the jurisdiction of the courts of the United States for the District of Columbia." [30] Appellees' and the District Court's interpretation of the 1912 and 1945 Acts ignores the unambiguously stated intent of the 1945 Congress to

**30.** Act of 31 Oct. 1945, ch. 443, § 103, 59 Stat. 552.

**31.** H.R.Doc.No.595, 79th Cong., 1st Sess. 2 (1945); S.Doc.No.598, 79th Cong., 1st Sess. 2 (1945).

**32.** *See, e. g., United States v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 99 L.Ed. 615 (1955); *City of New York v. Train,* 494 F.2d 1033, 1049–50 (D.C.Cir. 1974), *aff'd,* 420 U.S. 35, 95 S.Ct. 839, 43 L.Ed.2d 1 (1975); *Wilderness Soc'y v. Morton,* 156 U.S.App.D.C. 446, 479 F.2d 842, 855–56 (D.C.Cir.), *cert. denied,* 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973).

We perplexingly note that the judge, who in the instant case granted appellees' motion to dismiss, apparently agreed, in an earlier unreported memorandum opinion, with the construction of section 103 now advocated by the United States and adopted by this court. In *United States v. Robinson Terminal Warehouse, Inc.,* Civil No. 1903–73 (D.D.C.1973), he wrote,

> The Court's jurisdiction is based upon 28 U.S.C. § 1345 (1970) (United States as plaintiffs); the Act of April 27, 1912, ch. 96, 37 Stat. 93; and the Act of October 31, 1945, ch. 443, 59 Stat. 552 (set out as a note under D.C.Code Ann. § 1–101 (1973)).
>
> The cited Act of October 31, 1945, was designed to quiet forever the dispute over the boundary between the District of Columbia and the Commonwealth of Virginia. Section 101 of that Act describes the boundary line . . . ; Section 102 cedes to Virginia the land lying on the Virginia side of the line so fixed; and Section 103 reserves certain rights to the United States. It is this last section which is important to the discussion of jurisdiction.
>
> Section 103 expressly confers jurisdiction upon "the courts of the United States for the District of Columbia to hear and determine suits to establish the title of the United States in all lands in the bed, marshes, and lowlands of the Potomac River, and other lands as described by said Act below the mean high-water mark of January 24, 1791 . . . ."

The phrase "said Act" refers to the Act of

"in no way affect[ ] property rights and claims as they [then] exist[ed] in [the Alexandria waterfront] area" [31] and renders section 103 of the 1945 Act absolutely meaningless. Since we can discern no reason for the inclusion of section 103, if Congress intended to establish pursuant to sections 101 and 102 a jurisdictional boundary between the District of Columbia and Virginia *for all purposes,* we reject the construction of the 1912 and 1945 Acts adopted by the District Court.[32]

> April 27, 1912, ch. 96, § 1, 37 Stat. 93
>
> . . . . .
>
> [Defendant] Robinson argues that the 1912 Act limits this Court's jurisdiction solely to cases concerning land "in the District of Columbia." Thus since the property in question here lies within the boundaries of the Commonwealth of Virginia, this Court lacks jurisdiction, and the action lies only in the United States District Court for the Eastern District of Virginia.
>
> Assuming, *arguendo,* that the disputed property does lie within Virginia's boundaries, the Robinson argument ignores the plain statutory language of Section 103, which clearly grants jurisdiction to this Court to hear *quiet title cases concerning the Potomac River generally and* reaffirms this Court's jurisdiction to hear quiet title cases concerning the Potomac River generally *and* reaffirms this Court's jurisdiction to hear quiet title actions concerning "land or water in the District of Columbia in, under, and adjacent to the Potomac River . . . ." *See* Act of October 31, 1945, ch. 443, § 103, 59 Stat. 552.
>
> It appears to this Court that what Congress attempted to do in the 1945 Boundary Act was to establish once and for all a clear and definite boundary between the District of Columbia and Virginia, based on all the relevant data available to it at that time. Section 103, clause 3, of that Act . . . was clearly intended by Congress to vest in the District Court for the District of Columbia original and exclusive jurisdiction to hear and decide quiet title cases which were sure to follow in the wake of the new legislation. The remainder of the language in Section 103, clause 3, that following the comma after "River", *i. e.,* "and other lands as described by said Act (the 1912 Act) below the mean high-water mark of January 24, 1791 . . . ", obviously reaffirms this Court's grant of jurisdiction contained in the Act of April 27, 1912, to wit, to hear and decide those quiet title cases concerning the Potomac River *and* land located in the District of Columbia. Thus, all the cases concerning Potomac River disputes are cognizable in this Court. Any other construction of clause 3 in Section 103 would

**308**

Recognizing that our decision may require the United States District Court for the District of Columbia to rule on several questions of Virginia landlord-tenant law while it ponders the ultimate resolution of this title dispute,[33] we, nevertheless, cannot ignore the express intent of Congress that this dispute be resolved in the United States courts for the District of Columbia. Although the federal district courts for the Eastern District of Virginia would probably have more expertise in handling these ancillary matters involving Virginia law, federal tribunals are not free to pick and choose among the various functions assigned to them by Congress.

In contrast to this recognized problem, we also note that the goals of judicial economy would not be furthered by splitting this dispute into two separate actions, as the District Court chose to do. Clearly, it is not an efficient utilization of scarce judicial resources to split a dispute involving the same or similar evidence and legal principles into two separate actions, which may eventually require the attention of two federal district courts, two United States courts of appeals, and then, possibly, the Supreme Court.

For these reasons we conclude that the District Court's dismissal of this action for

lack of jurisdiction was based on an erroneous construction of the governing jurisdictional statutes. Accordingly, for a trial on the merits in the District Court this case is

*Reversed and Remanded.*

violate that principle of statutory construction which dictates that all words in a statute are to be assigned meaning and that nothing therein is to be construed as duplicative or surplusage. *G. Sutherland, 2 Statutory Construction* § 4705 (3d ed. 1943).

This Court accordingly assumes jurisdiction of the suit.

Government Brief, Appendix B, at 30–32. We find it difficult to reconcile what we feel was a correct statement of the law in *Robinson Terminal* with the following excerpt from the same District Judge's later opinion in the instant case:

The Government would seek to rebut what to this Court are the plain terms of the 1945 Act by saying that if Congress intended that an action such as this one was to be litigated in Virginia, Congress would not have needed or used the language it employed in § 103. But that position violates the well-known principle of statutory construction that all words in a statute are to be assigned a meaning and not to be considered mere surplus-

age. *See* 2 G. Sutherland, Statutory Construction § 4705 (3d ed. 1943).
386 F.Supp. at 1292.

33. *E. g.*, the rent dispute between the City of Alexandria and Old Town Yacht Basin, Inc., both appellees in the instant proceeding, wherein we entered an order on 26 March 1976 enjoining the City of Alexandria

from taking any action to remove appellee, Old Town Yacht Basin, Inc., from the premises which it now occupies until further order of the Court on condition that appellee Old Town Yacht Basin, Inc., shall pay rent of $300.00 each month, when and as the same becomes due, to the City of Alexandria with the requirement that such funds be kept separate from other city funds until further order of this Court.

Consistent with our disposition of the instant case, we will vacate this order upon issuance of the mandate to the District Court. At that time the matter will be in the hands of the District Court.