UNITED STATES of America, Plaintiff,

v.

HERBERT BRYANT, INC., et al., Defendants.

Civ. A. Nos. 73–2211, 73–1903.

United States District Court,
District of Columbia.

May 14, 1990.

Lisa K. Hemmer, Dept. of Justice, Environmental & Natural Resources, Washington, D.C., for U.S.

Philip G. Sunderland, Office of the City Atty., Alexandria, Va., for City of Alexandria.

Steven C. Pallat, Washington, D.C., for Old Town Yacht Basin.

## OPINION

JOHN GARRETT PENN, District Judge.

These cases come before the Court on the cross-motions for summary judgment filed by the City of Alexandria (Alexandria) and Old Town Yacht Basin, Inc. (OTYB).

The cases involve the continuing controversy over the dispute that has been pending for one hundred and forty three years concerning the boundary between the District of Columbia and the Commonwealth of Virginia. *See United States v. Herbert Bryant, Inc.*, 177 U.S.App.D.C. 152, 543 F.2d 299 (1976), *cert. den.*, 429 U.S. 1091, 97 S.Ct. 1100, 51 L.Ed.2d 536 (1977). The dispute has its genesis in the decision to create a federal district, within which to place the seat of government of the new nation, the United States of America. In order to create the federal district, Maryland and Virginia ceded certain lands to the federal government in 1791. Thereafter, in 1846, the federal government retroceded the Virginia portion of the federal capital to Virginia, and it was this act that created the years old controversy. Through the act of retrocession, the federal government returned to the Commonwealth of Virginia, only those lands and waters received from that state in 1791. The boundary of Maryland extended to the high water mark on the Virginia side of the Potomac River; thus, when Maryland ceded land for the federal district, it ceded not only the land but portions of the Potomac River as well. When the Virginia portion of the federal district was returned to that state, that portion obviously did not include any part of the Potomac River. At first blush it would appear to present no problem, however, a problem was created since the boundary between Virginia and Maryland, absent legislation or agreement, had to be the line of 1791, the high water mark in 1791, and over the years, either by way of accretion or erosion, that mark has disap-

peared. The parties have engaged in taking core samples to relocate the 1791 line, however, up to this date their efforts have been unsuccessful.

The above extremely brief statement of history sets the scene for the present controversy between Alexandria and OTYB.

## I

### A. The property at issue.

The property at issue is the real property located in Alexandria, Virginia, east from South Union Street, sometimes referred to as Union Street, to the Potomac River, bounded on the north by what would be a continuation of Wilkes Street, and on the south by what would be a continuation of Gibbon Street. That property consists of five parcels, Parcels A, B–1, B–2, C and D. Most of the area consists of water, and the property is occupied by OTYB. *See* Appendix 1. Parcel A consists of the land which would be an extension of Wilkes Street east of South Union Street. For the purposes of this Opinion, this property will sometimes be referred to as the "Wilkes Street Extension." Parcel D consists of the land which would be an extension of Gibbon Street east of South Union Street. For the purposes of this Opinion this property will sometimes be referred to as the "Gibbon Street Extension." Parcels A and D are fast lands[1]. Parcels B–1, B–2 and C are fast lands and submerged lands bounded on the north by Parcel A and on the south by Parcel D and running east from South Union Street to the bulkhead line. All of the subject property is bounded on the east by the bulkhead line as is shown in Appendix 1. All of the above parcels will be described generally as the "Tract".

### B. The claims of the parties.

The United States claims title to all lands, whether fast lands or submerged lands located within the Tract. The claim of the United States is based upon its contention that *all* of the currently submerged lands in the bed of the Potomac River and *all* fast lands along the Alexandria water-

---

1. "Fast lands" are lands above or landward of    the existing high water mark.

front created by filling in the Potomac River after 1791 belong to the United States. The United States states its claim as follows:

> [A]s a result of the American Revolution, the State of Maryland owned the bed of the Potomac River to the high water mark on the Virginia bank in fee simple; Maryland conveyed all of its right, title and interest in the bed of the Potomac River within the limits of the District of Columbia as laid out in 1791, which included the Potomac River at Alexandria, to the United States; under federal law and the law of Maryland in 1801, the law applicable to the United States' title claim, title to any fill placed on the bed of the Potomac River after 1791 remains in the United States as sovereign owner of the bed; the fast lands claimed by various defendants in these cases, including fast lands on the OTYB Tract, were created by fill placed on the bed of the Potomac River after 1791; and United States has never conveyed its interest in the submerged lands or fast lands claimed by various defendants; and, consequently, the United States has fee simple title to all such submerged lands and fast lands, including the entire OTYB Tract.

Memorandum of the United States in Support of Alexandria's Motion for Summary Judgment Against OTYB (U.S. Memorandum) at 3–4.

OTYB claims title to Parcel A by adverse possession and under a deed. *See* OTYB Admission No. 36–40 [2]. OTYB claims title to fast lands within Parcels B–1 and D by adverse possession. *See* OTYB Adm. No. 15–16, 26–29, 33–35. OTYB does not claim title to Parcels B–2 and C. *See* OTYB Admission No. 25 and 32.

Alexandria claims title to Parcels A and D by virtue of their claim that those parcels are public streets in which OTYB has no right, title or interest, and it claims title to Parcels B–1, B–2 and C under deeds from various parties.

**2.** "OTYB Adm. No." refers to OTYB's responses to Alexandria's First Request for Admissions

There is another claim that does not directly relate to the issue raised in the present motion but which does relate to the overall question presented in this litigation. Old Dominion Boat Club (ODBC) and the United States have also filed cross-motions for summary judgment. ODBC contends that under federal, Maryland and Virginia law, riparian property owners along the Potomac River own all fast lands within a bulkhead established by the Corps of Engineers in 1909, regardless how the lands were created. This issue, and the land involved in the ODBC dispute, are addressed in separate motions and are not subject of this Opinion.

## II

*C. The issue of the 1791 line on the Old Town Yacht Basin claim.*

Before addressing the instant motions, the Court must consider whether it can decide the motions without having resolved the major issue raised in this litigation, namely, the issue relating to the boundary dispute and the line of 1791.

As the Court understands the argument of OTYB, it is that the Tract is *not* in the City of Alexandria. OTYB contends that some of the property is located in the District of Columbia, and presumably subject to the laws of the District of Columbia; and other parts of the Tract are located in the Commonwealth of Virginia and thereby subject to the laws of that jurisdiction, and that the portions of the Tract located in Virginia are in the County of Arlington but *not* in the City of Alexandria.

Alexandria argues that the Tract is located in Virginia and in the City of Alexandria, and the United States appears to agree with Alexandria.

This action was filed in 1973. A year later, the District Court held that this court lacked jurisdiction to determine title to any land situated within the Commonwealth of Virginia. *United States v. Herbert Bryant, Inc.,* 386 F.Supp. 1287 (D.D.C.

served December 14, 1987.

1974), *rev'd*, 177 U.S.App.D.C. 152, 543 F.2d 299 (1976). While the Court of Appeals discussed the boundary line issue, the issue was not resolved by that court. The Court of Appeals observed:

> The United States takes the position, with which we agree, that, since this retrocession [Act of Retrocession of County of Alexandria, approved, July 9, 1846, 9 Stat. 35, ch. 35, found in 1 D.C. Code Ann. at 78–79] included only those lands which Virginia had originally ceded in 1791, the boundary in 1846 between the District of Columbia and Virginia became the high water mark on the Virginia side of the Potomac River as of 24 January 1791. Any land, either submerged or fast, on the District of Columbia side of the 1791 high-water mark remained in the District of Columbia, since it was part of the 24 January 1791 Maryland cession to the United States.

177 U.S.App.D.C. at 155, 543 F.2d at 302. The Court of Appeals then went on to address the 1945 Act, Act of 31 Oct. 1945, ch. 443, 59 Stat. 552, found in 1 D.C.Code Ann. at 118–120, relating to the boundary line between the District of Columbia and the Commonwealth of Virginia. The Court of Appeals noted:

> Since 1912 the Alexandria waterfront has been extended (artificially and perhaps naturally) into the Potomac River at several places, and jurisdictional uncertainties increasingly have plagued law enforcement activities in the area. To alleviate this problem, Congress passed the 1945 Act to "establish a definite clear-cut boundary line, easy to recognize and convenient <u>for police and court jurisdiction</u>...." By ceding <u>concurrent jurisdiction</u> to the Commonwealth of Virginia over all lands located between the pierhead line and the mean high-water mark of 1791, **this statute established the pierhead line as the new jurisdictional boundary between Virginia and the District of Columbia, at least for <u>law enforcement (i.e., police and court purposes</u>).**

U.S.App.D.C. at 156, F.2d at 303 (underlined portions in the original, bold emphasis this Court's). The court then went on to state that section 103 of 1945 Act "preserved the exclusive jurisdiction of the United States District Court for the District of Columbia to determine title to lands lying along the Alexandria waterfront." *Id.* The court later states: "Section 101 of the 1945 Act established the <u>new</u> boundary between the District of Columbia and Virginia for **law enforcement (and perhaps other) purposes.**" U.S.App.D.C. at 159, F.2d at 306 (footnote omitted, underlined portion in the original, bold emphasis this Court's).

The only issue before the Court of Appeals at that time was whether the 1945 Act had changed or modified Congress' grant of jurisdiction to this court, set forth in the 1912 Act, Act of 27 April 1912, ch. 96, 37 Stat. 93, to hear and determine the title of the United States in the subject lands. While the court referred to the "boundary," this Court does not read the decision as deciding any more than that this court has jurisdiction to decide the above title dispute. The court refers to the "new" jurisdictional boundary but states that the "new" jurisdictional boundary is "at least for law enforcement (i.e. police and court) purposes." U.S.App.D.C. at 156, F.2d at 303. Thereafter, the court referred to Congress establishing the pierhead line in 1945 "for law enforcement and *perhaps* other purposes." U.S.App.D.C. at 157, F.2d at 304. Yet, later the court again indicated that its decision is limited when it stated that the "1945 Act established the *new* boundary ... for law enforcement (*and perhaps other*) purposes." U.S.App. D.C. at 159, F.2d at 306.

### D. The effect of the 1945 Act.

■ After reviewing the 1945 Act, the Court is satisfied that the Act does establish a "new" boundary line between the District of Columbia and the Commonwealth of Virginia. 1945 Act, § 101. Moreover, as of the effective date of the Act, all land on the Virginia side of the Potomac River, lying between the boundary set forth in Section 101 and the mean high water mark as it existed on 24 January 1791, is now located within the Com-

monwealth of Virginia, regardless of which state, Maryland or Virginia, the land was located in prior to the cession of 1791. 1945 Act, § 102. This is made quite clear by the language of Section 102 providing that the land or water between the boundary created by Section 101, hereinafter sometimes referred to as the "1945 line" and the 1791 high water mark on the Virginia side, hereinafter sometimes referred to as the "1791 line", "is hereby ceded to and declared henceforth within the territorial boundaries, jurisdiction, and sovereignty of the State [Commonwealth] of Virginia." 1945 Act, § 102.

The Court of Appeals referred to Section 101 of the 1945 Act as establishing a "new" boundary between the District of Columbia and Virginia "for law enforcement (and perhaps other) purposes," but by footnote stated, "*[b]ut see* the language from both the House and the Senate reports on the 1945 Act quoted in the text accompanying note 22, *supra*." 177 U.S.App.D.C. at 159, n. 23, 543 F.2d at 306, n. 23. Just prior to citing to footnote 22, the Court of Appeals quoted from the House and Senate reports on the 1945 Act:

..... The bill in no way affects property rights and claims as they now exist in this area. It establishes definitely the Federal courts in which all *criminal* offenses will be tried [i.e., the District Court for the Eastern District of Virginia].

The portion of the text quoted in footnote 22 quotes from the House report on the 1912 Act as follows:

The bill has no other effect than to provide a means to quite title.... The matter of future disposition of the land is not affected and the question of acquirement of private rights which may de [*sic*] determined to exist, as well as the disposition of the land confirmed in the United States, is left to the future action of the Congress.

Nothing in the language quoted above detracts from the clear language of the 1945 Act establishing a new boundary for virtually all purposes between the District of Columbia and Virginia. The language

of the 1945 Act is clear and unambiguous; it states what it means and it means what it states. This being the case, there is no need to refer to the legislative history of the 1945 Act to arrive at a correct interpretation. *See* Sutherland Stat. Const. §§ 46.-01–46.04 (Sands 4th ed. 1984 rev.). Notwithstanding this admonition, reference to the legislative history does not change in any way the interpretation the Court has placed on the statute. The House and Senate Reports and the letters attached thereto make clear that Congress sought to establish finally a definite boundary line between the District of Columbia and Virginia. *See* H.R.Rep. No. 595, 79th Cong., 1st Sess. (1945); S.Rep. No. 598, 79th Cong., 1st Sess. (1945). Both reports refer to the long standing dispute over the 1791 line, recognized by the Supreme Court in *Smoot Sand & Gravel Corporation v. Washington Airport, Inc.*, 283 U.S. 348, 51 S.Ct. 474, 75 L.Ed. 1109 (1931), and the fact that the 1791 line has never been "specifically determined and monumented," all of which led to frustration in the enforcement of criminal laws. Although the reports refer to the purpose of the bill as being "to establish a definite clear-cut boundary line, easy to recognize *and* convenient for police and court jurisdiction between the District of Columbia and Virginia," the reference to "police and court jurisdiction" was not to suggest that the boundary line served no other purpose. The fact that the 1945 Act sets forth a clear and detailed legal boundary in Section 101, and further, sets forth how that boundary line is flexible whenever the Virginia shore is altered by artificial fills and excavations or by alluvion or erosion, indicates that Congress was drawing a new boundary for *all* purposes. The fact that Congress provided that the new boundary would not affect the jurisdiction of this court to determine the issues of title of land lying between the 1791 line and 1945 line is of no moment.

In establishing the new 1945 boundary line, Congress also attempted to prevent a controversy like that revolving around the location of the 1791 line from arising again. Congress provided that the United States Coast and Geodetic Survey is to suitably

mark and establish the 1945 line and from time to time mark any changes in the line as may be made pursuant to Section 101 of the 1945 Act.

The Court concludes, therefore, that the 1945 line is now the political boundary between the District of Columbia and Virginia for all purposes, except as may have been specifically reserved in the Act. To the extent that it might be argued that Congress established no more than a boundary for law enforcement purposes, that argument must be rejected.

■ The change in the boundary in 1945 had no effect on the title to the land lying between the 1945 line and the 1791 line. Thus, land lying east of the 1791 line and titled in the United States and arguably in the District of Columbia, is still titled in the United States notwithstanding that it may lie west of the 1945 line and is clearly now within the Commonwealth of Virginia.

One result of the new boundary is that any argument that the OTYB lies partially or wholly within the District of Columbia must be rejected. While it may not be clear whether the 1791 line intersects any portion of the OTYB Tract, it is clear that the Tract is located west of the 1945 line and that therefore OTYB is within the Commonwealth of Virginia and subject to the laws of that state.

Thus, so much of the argument submitted by OTYB that is based on the contention that the Tract is located within the District of Columbia must be rejected. Likewise, so much of the argument that is based on the contention that the Tract is not within Virginia must also be rejected.

*E. The issue as to whether the Tract is located within the City of Alexandria.*

■ OTYB also argues that the Tract is not located within Alexandria, but the Court concludes that the argument is without merit.

The United States takes the position that the Tract is within the bounds of Alexandria and in support of that contention, has traced the property from 1796. As the United States notes, when Maryland and Virginia ceded the land making up the original District of Columbia to the United States in 1791, the boundary between the two states was the high water mark on the Virginia side of the Potomac River. Under the terms of the legislation accepting the cession, it was provided that the lands ceded by Virginia would be subject to the laws passed by the Virginia legislature until such time as the United States Congress assumed jurisdiction. *See* An Act For Establishing the Temporary and Permanent Seat Of The Government Of The United States, Approved, July 16, 1790, 1 Stat. 139, ch. 28, found in 1 D.C.Code Ann. at 40–41. Congress provided that the land to comprise the District of Columbia was accepted provided: "That the operation of the laws of the state within such district shall not be affected by this acceptance, until the time fixed for the removal of the government thereto, and until Congress shall otherwise by law provide." *Id.,* Section 1.

In 1796, the Virginia legislature extended the boundaries of Alexandria and provided that the Potomac River is the east boundary of the town. Va. Act 1796, ch. 32, 2 Va.Stat. 40, as amended by Va. Act 1797, ch. 60, 2 Va.Stat. 122. Congress assumed jurisdiction over the District of Columbia in 1801, and in doing so, preserved the laws relating to the former Virginia territory. Congress amended the charter of Alexandria but included a provision that Alexandria "shall extend to the limits heretofore prescribed by law." Act of February 25, 1804, ch. 15, sec. 4, 2 Stat. 255, 257. Then in 1846, Congress receded the territory back to Virginia. In assuming jurisdiction, the Virginia legislature ratified and confirmed all Virginia statutes relating to the territory which had been enacted prior to cession and all federal legislation enacted during the period the territory was within the federal jurisdiction. Finally, in 1932, the Virginia legislature enacted a new charter for Alexandria which provided that the east boundary of Alexandria was "along the meanderings of the west shore line of said Potomac River." Va, Act 1932, ch. 280, sec. 1. Yet another new charter for Alexandria was enacted in 1950 providing

once again that the east boundary of the city is the Potomac River. The state law also provides that the Alexandria east boundary "shall embrace all wharves, piers, docks and other structures" erected along the Potomac River. Va.Code 15.1–1031.

This brief history of the City of Alexandria demonstrates that the east boundary of the city was and is the Potomac River. Thus, it is clear that the Tract lies within the city, and is not within some other jurisdiction. In so holding, the Court emphasizes that the above relates to the political boundary and not to the ownership of the property making up the Tract.

Thus, the Tract claimed by the United States, Alexandria and OTYB lies within the City of Alexandria, Virginia.

### III

It is not necessary to determine the question of title as between the United States and Alexandria in order to decide the instant motions. If OTYB asserts a valid title claim against the property making up the Tract, then it is obvious that title does not lie with either the United States or Alexandria, and the question concerning the Tract is at an end. On the other hand, if OTYB cannot demonstrate that, either there is a factual issue as to the question of its purported lack of a valid title claim, or if there is not a factual issue, that it asserts a valid title claim to the Tract, then summary judgment most be entered against OTYB. In the latter event, the case will then move on to the next step insofar as the Tract is concerned, that being determination of the respective claims asserted by the federal and city governments.

### F. *Old Town Yacht Basin's claim based on adverse possession.*

OTYB claims title to Parcel A by adverse possession as well as under a deed, and claims title to Parcels B–1, and D by adverse possession. Alexandria contends that Parcels A and D are public streets and the city claims title to Parcels B–1, B–2 and C under deeds. As was noted above, Par-

cels B–2 and C are not at issue in this proceeding. The United States claims title to all currently submerged lands in the bed of the Potomac River and to all fast lands along the Alexandria waterfront that were created by filling in the Potomac River after 1791. In brief, the United States contends that after the American Revolution, Maryland owned the bed of the Potomac River to the high water mark on the Virginia bank in fee simple. As a result of the 1791 cession, Maryland conveyed all of its right, title and interest in the bed of the Potomac River within the limits of the District of Columbia which included the Potomac River at Alexandria, to the United States, and that under federal law and the law of Maryland in 1801, the law applicable to the United States' claim for title, title to any fill placed on the bed of the Potomac River after 1791 remains in the United States as sovereign owner of the bed.

Turning to the claims asserted by OTYB, assuming *arguendo* that the United States' claim to title is a valid one, then it follows that parcels A, B–1 and D are owned by the United States. OTYB cannot acquire title to lands owned by the United States by way of adverse possession. *See United States v. California,* 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947); *United States v. Denby,* 522 F.2d 1358 (5th Cir.1975), *reh. denied,* 525 F.2d 693 (1975); *United States v. 1629.6 Acres of Land, More or Less, in Sussex County, State of Delaware,* 503 F.2d 764 (3d Cir.1974); *United States v. Springer,* 321 F.Supp. 625 (C.D.Calif.1974), *aff'd per curiam,* 478 F.2d 43 (9th Cir. 1972); *United States v. Osterlund,* 505 F.Supp. 165 (D.Colo.1981).

If the United States' claim to Parcels A, B–1 and D is not a valid claim, then the question arises as to whether the claim asserted by Alexandria is valid. With respect to Parcels A and D, Alexandria contends that those parcels, which would be the logical extensions of Wilkes Street and Gibbon Street east of Union Street were dedicated as public streets and accepted as such by the city. OTYB disputes this contention.

█ In Virginia, neither adverse possession nor prescriptive rights can be acquired in property which is affected with a public interest or dedicated to a public use. *See Lynchburg v. Chesapeake & Ohio Ry. Co.,* 170 Va. 108, 195 S.E. 510 (1938); *DePriest v. Jones,* 21 S.E. 478 (1895); *Bellenot v. Richmond,* 108 Va. 314, 61 S.E. 785 (1908). *See also, Teter v. Teter,* 163 W.Va. 770, 260 S.E.2d 270 (1979). Thus, assuming that Parcels A and D represent extensions of Wilkes Street and Gibbon Street, and further assuming that those parcels have been dedicated for that public use, OTYB would be unable to acquire title to those properties by way of adverse possession.

In 1762, the Virginia legislature enlarged Alexandria to include lands south of a line between what is now Wolfe Street and Wilkes Street. Va. Act 1762, Ch. 25, 7 Hen.Stat. 604. In a deed dated December 20, 1774, one John Alexander dedicated Wilkes Street running to the Potomac River and parallel with Wolfe Street. United States Exhibit 15. In a later deed dated ·April 21, 1785, Alexander's executors dedicated Gibbon Street running to the Potomac River and parallel with Wilkes Street. United States Exhibit 16. Alexandria has set forth in its memorandum, that it appears that Wilkes and Gibbon Streets were established as a result of the 1762 expansion of Alexandria.

A map prepared in 1763 by George West (Alexandria Exhibit 3) shows that east—west streets were added to the southern end of Alexandria during that expansion. As the city notes, the map depicts a "Wolf" Street as the southern most named street ·in Alexandria and shows that the expansion created two additional but unnamed streets south of Wolf which ran to the river. Subsequent maps demonstrate that those two streets immediately south of "Wolfe" Street are Wilkes and Gibbon. *See* Gilpin Map (Alexandria Exhibit 4).

In 1796, the Virginia legislature, observing that proprietors had laid off lots contiguous to the town of Alexandria, expanded the boundaries of the town to include such areas, an expansion that included Wilkes Street and Gibbon Street. Va. Act 1796, Ch. 32, 2 Va.Stat. 40 as amended by Va. Act 1797, ch. 60, 2 Va.Stat. 122. Under the law applicable at that time, the deeds from John Alexander and his executors amounted to a dedication of Wilkes Street and Gibbon Street and the act of incorporating those areas into the town constituted an acceptance of that dedication.

After Wilkes Street and Gibbon Street had been accepted as public streets, as noted above, the bank of the Potomac River was moved eastward as a result of accretion or fill. When a public street is laid out running to a river, the street automatically extends over any new land created by accretion or fill. *See Frater v. Baylan Street Wharf Co.,* 57 Fla. 63, 49 So. 188 (1909).

Thus, if it is assumed that the title to the Tract is with the United States, then OTYB could not have acquired title to that property by virtue of adverse possession. Assuming that title to the Tract was not with the United States, but with Alexandria, OTYB could not have acquired title by adverse possession to those portions of the Tract which had been dedicated as public streets.

With respect to Parcel B–1, any claim that OTYP would assert against title in the United States by virtue of adverse possession would be defeated for the reasons set forth above. On the other hand, if the United States does not have title in Parcel B–1, the question arises whether OTYB has satisfied the requirements to establish adverse possession. Under the law of Virginia, adverse possession does not result in good title until the possession is actual, exclusive, hostile, open and notorious, accompanied by a bona fide claim of title, and continuous without interruption for a period of 15 years. *See McIntosh v. Chincoteague Volunteer Fire Co.,* 220 Va. 553, 260 S.E.2d 457 (1979); *Payne v. Consolidation Coal Co.,* 607 F.Supp. 378 (E.D.Va. 1985). As Alexandria argues, proof of the element of hostility requires the claimant to show that the possession was adverse to and inconsistent with the title of the true owner. If, the claimant's original possession was with the recognition of the title

holders' superior title, then the possession would not be "hostile" to the owner's legal title. *See Hall v. Clinchfield Coal Corp.*, 161 Va. 177, 170 S.E. 564 (1933). As to the question of "open" and "notorious," OTYB must demonstrate that its possession was open and demonstrated to the extent that it was enough to be known actually or constructively by the title holder of the property who despite this fact failed to take any steps to terminate OTYB's possession and who in effect accedes to it. If the claimant's claim is not accepted by the titleholder, then the claimant's possession is not as a matter of law "open" or "notorious".

■ With respect to Parcel B, which includes Parcels B–1 and B–2, on September 1, 1955, the then owner of Parcel B, the Southern Railway Company, granted a license to George T. Crowder (Crowder) and Arthur C. Saffelle (Saffelle) for use of Parcel B. Alexandria Statement Of Material Facts As To Which There Is No Genuine Dispute (Alexandria Statement), par. 12 and Exhibit F. Thereafter, on December 19, 1957, Crowder and Saffelle assigned that lease to OTYB. Alexandria Statement, par. 13, Exhibit G. In 1972, after OTYB refused the request of Southern Railway Company to vacate Parcel B, Southern Railway Company filed an eviction action in Alexandria Circuit Court, *Southern Railway Company v. Old Town Yacht Basin, Inc.*, At Law No. 10223, Circuit Court for the City of Alexandria. *Id.*, par. 14. The Circuit Court ruled in favor of the Southern Railway Company in January, 1973, holding that OTYB was holding possession unlawfully. *Id.*, par. 15, Exhibit H. On June 21, 1974, that court issued a writ of possession for Parcel B against OTYB. *Id.*, par. 16, Exhibit I. When OTYB refused to vacate the land, the Virginia Circuit Court held it in contempt on June 25, 1975. *Id.*, par. 17, Exhibit J. Finally, the Southern Railway Company conveyed all of Parcel B to Alexandria. *Id.*, par. 18, Exhibit E.

As the above demonstrates, OTYB occupied Parcel B with the consent of the owner between 1957 and as late as 1972 when the Southern Railway Company filed an action to have OTYB vacate the property. Between 1972 and the present date, OTYB has been in litigation over the ownership of Parcel B; accordingly, it is clear that OTYB's possession of Parcel B was not "open" and "notorious." This being the case, OTYB could not have established title by virtue of adverse possession.

■ The facts relating to Parcels A, D and C are similar. Alexandria acquired title to Parcel C by deed on August 11, 1942. *Id.*, par. 25, Exhibit L. On March 29, 1956, Alexandria entered into a lease agreement for a term of ten years with Alexandria Marina, Inc. The lease was signed on behalf of the company by Crowder and Saffelle, and the agreement was later assigned to OTYB. *Id.*, par. 26, Exhibit M. Prior to the end of the lease agreement on Parcel C, Alexandria and OTYB engaged in negotiations in an effort to agree to new terms for the lease of the property, *see* Exhibit N, and during this period OTYB's occupation of Parcel C occasionally spilled over onto Parcels A and D. *Id.*, par. 27. When Alexandria and OTYB could not reach an agreement on a new multi-year lease, the Alexandria City Manager informed OTYB that it could occupy the property on a month to month basis with rent at the rate of $300.00 per month. *Id.*, par. 28. OTYB paid Alexandria $300.00 per month between July 1968 to December 1971, at which time OTYB ceased making payments. *Id.*, par. 29. Alexandria then filed an action against OTYB to recover rental amounts due on the rental agreement, and on July 10, 1974, the Alexandria Circuit Court entered judgment for Alexandria in the amount of $7,800.00. *Id.*, pars 30, 31, Exhibit O. When OTYB refused to honor the judgement, Alexandria served notice on OTYB to pay the rent or deliver Parcel C to the city. *Id.*, par. 32, Exhibit P. OTYB filed a motion for temporary restraining order in this case on November 21, 1974, and that motion was granted on November 26, 1974 and extended to December 4, 1974. *Id.*, pars. 33 and 34. Alexandria's efforts to collect the rent or have OTYB vacate Parcel C were fruitless, and on one occasion, the United States Court of Appeals for the District of Colum-

bia Circuit enjoined Alexandria from seeking to remove OTYB from the property. *Id.*, par. 36, Exhibit R (Order entered in *United States v. Herbert Bryant, Inc.*, 543 F.2d 299 (D.C.Cir.1976)).

It is clear then that to the extent that OTYB may seek to acquire title to Parcels A and D, pursuant to its occupation of Parcel C, the claim must fail. As was the case with Parcel B, OTYB entered the property by agreement with Alexandria, remained on the property pursuant to the agreement, and when the agreement broke down, efforts by Alexandria to collect rents due or to have OTYB vacate the property were restrained by orders entered in the District Court and the Court of Appeals. Under these circumstances, OTYB cannot make out a claim that its possession of the property was "open" and "notorious." To the extent that OTYB's occupation of Parcel C spilled over onto Parcels A and B, and to the extent that OTYB's claim to Parcels A and D is based upon that occupation, it is clear that OTYB cannot claim title to Parcels A and D based on adverse possession for the same reason it cannot claim title to Parcel C.

Based upon the above discussion, the Court must conclude that any claim OTYB asserts to the Tract by virtue of adverse possession again the United States or Alexandria is without merit.

### G. Claims Made By Old Town Yacht Basin Based On Deed.

■ The last issue raised with respect to the claim made by OTYB is whether it holds a valid deed to the Tract or any portion of the Tract. It is the Court's understanding that OTYB also claims title to Parcel A by virtue of a deed. The deed is a quitclaim deed, recorded on April 5, 1957, from Edward Dean, sometimes known as "Turk" Dean to Crowder and Saffelle which purports to convey title to all or almost all of Parcel A. Alexandria Statement, par. 6, Exhibit C. By deed recorded on October 23, 1957, Crowder and Saffelle purported to convey all or almost all of Parcel A to OTYB. *Id.* par. 7, Exhibit D. OTYB does not claim title to Parcel

A or any portion thereto by any deed other than by virtue of the above deed from Crowder and Saffelle. *Id.*, par. 8, OTYB Admissions No. 39.

Alexandria contends that Dean did not acquire title to Parcel A or any portion thereof by virtue of a deed or any other legal instrument; in other words, Alexandria contends that Dean did not convey any title to Crowder and Saffelle because he had no title to convey. If this be the case, then obviously, Crowder and Saffelle could not have conveyed any title to OTYB.

To support its claim with respect to the questioned Parcel A deed, Alexandria relies upon the affidavit of Frederick R. Garner, Jr., who has served as a title examiner since December 7, 1953. Alexander Statement, par. 2, Exhibit B (Garner affidavit). Garner states that he has reviewed the land records of Parcel A and that in this opinion, Parcel A is a part of Wilkes Street. Exhibit B, par. 6. He traced the property back to May 18, 1785. *Id.*, par. 7. He found only two deeds conveying title to the bed of Wilkes Street east of Union Street. *Id.*, par. 12. One deed was the above mentioned deed from Dean to Crowder and Saffelle. He notes that the deed recites that Dean has been in possession of the property for more than 40 years. *Id.*, par. 12(a), Exhibit C. Garner states that his review of the records reflects that there is no record of Dean ever acquiring title to the property, and his review of the records relating to the Dean claim went back as far as 1910. *Id.* He expresses the opinion that the deed from Dean to Crowder and Saffelle is a complete nullity. *Id.* The second deed was the deed from Crowder and Saffelle to OTYB.

A careful review of the Dean deed reveals that Dean does not allege that he acquired title by deed or other instrument, but rather, he suggests he acquired title by adverse possession. The deed provides that: "The party of the first part [Dean] represents that he has been in *hostile, open, exclusive, notorious, visible, continuous and uninterrupted possession and control of the land hereby conveyed for*

*more than forty years under a claim of ownership of said land."* Exhibit C.

Assuming that Dean purported to acquire title by adverse possession, his claim faces the same impediments as the claim asserted by OTYB; that is, he sought to claim the land by adverse possession, but he cannot do so since Parcel A was dedicated as a public street, if owned by Alexandria, or was owned by the United States. Under these circumstances, the Court must conclude that OTYB did not acquire title to Parcel A by deed.

### IV.

In sum, the Court concludes that the 1945 line establishes the political boundaries between the District of Columbia and the Commonwealth of Virginia but that Act does not affect the title of the claimants to the Tract, namely, the United States, Alexandria, or OTYB. The Court further concludes that it can dispose of the instant cross motions without resolving the title dispute between the United States and Alexandria. The Court further concludes that the Tract is located in the Commonwealth of Virginia and in the City of Alexandria. Finally, the Court concludes that OTYB cannot establish title to the property, or any portion thereof, by virtue of adverse possession. To the extent that OTYB seeks to establish title to Parcel A, by virtue of the Dean deed, that claim must also fail because the deed from Dean to Crowder and Saffelle reflects that Dean claimed title to the land by virtue of adverse possession. Parcel A is the extension of Wilkes Street, and as this Court has already recognized, one cannot acquire title to land by adverse possession when the land has been dedicated for a public purpose, here, a street. Moreover, while Dean asserted in his quit claim deed to Crowder and Saffelle that he had title to the land by virtue of adverse possession, nothing in the record supports that claim.

Taking all of the above matters into consideration the Court must conclude that OTYB has not asserted a valid claim to any of the parcels making up the Tract. Accordingly, the Court denies OTYB's motion for summary judgment and grants Alexandria's motion for summary judgment in part and denies it in part. So much of Alexandria's motion which contends that OTYB does not have title to the Tract or any portion thereof, is granted, so much of Alexandria's motion for summary judgment which contends that there are funds and rents due from OTYB to Alexandria by virtue of Alexandria's ownership of the property, cannot be determined at this time and must await a decision respecting the claims made by Alexandria and the United States. To that extent, Alexandria's motion for summary judgment is denied.

An appropriate Order has been entered.

### ORDER

This comes before the Court on cross motions for summary judgment filed by the City of Alexandria and Old Town Yacht Basin, Inc. After giving careful consideration to the motions and opposition thereto, together with the record in this case, and the Memoranda submitted by the United States, the Court concludes, for the reasons set forth in the accompanying Opinion that the motion for summary judgment submitted by Old Town Yacht Basin, Inc. must be denied, and that the motion for summary judgment submitted by the City of Alexandria should be granted in part and denied in part, and it is further

ORDERED that Old Town Yacht Basin, Inc. does not have valid title in the Tract of land set forth in Appendix 1, said Tract made up of Parcels A, B–1, B–2, C and D; and it is further

ORDERED that the Court will enter such other orders as may be necessary to effectuate this judgment.

APPENDIX I

PLAT
SHOWING THE LAND REQUIRED
FOR PUBLIC STREET AND MARINA PURPOSES
BY
THE CITY OF ALEXANDRIA, VIRGINIA

SCALE: 1"=100'                    FEBRUARY 5, 1988

PREPARED BY: SURVEY SECTION
DEPARTMENT OF TRANSPORTATION & ENVIRONMENTAL SERVICES
ALEXANDRIA, VIRGINIA

RW 2149                                    PLAT S86-017A